UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

In re:                                                  :
                                                        :
GENERAL MARITIME CORPORATION,                           :
                                                        :
             Debtor.                                    :
                                                        :
————————————————————————:
                                                        :
DONALD C. MARRO,                                        :          **OPINION AND ORDER**
                                                        :
             Appellant,                                 :          13 Civ. 5019 (ER)
                                                        :
             v.                                         :
                                                        :
GENERAL MARITIME CORPORATION,                           :
                                                        :
             Appellee.                                  :
————————————————————————x

Ramos, D.J.:

      Donald Marro ("Appellant"), proceeding *pro se*, appeals from an order of the United

States Bankruptcy Court for the Southern District of New York (the "Disallowance Order") that

expunged an $81,250 claim he filed in the underlying Chapter 11 bankruptcy proceeding.  Doc.

1.[1]  The reorganized debtors-in-possession, General Maritime Corporation and certain of its

subsidiaries (collectively, "Appellees"),[2] objected to a series of claims, including Appellant's, on

the grounds that the claims were subject to mandatory subordination under the Bankruptcy Code

and consequently would not receive distributions under the applicable reorganization plan.[3]  The

---

[1] References to "Doc." refer to documents filed in the instant appeal.  References to "Bankr. Doc." refer to
documents filed in the underlying bankruptcy proceeding, *In re General Maritime Corporation, et al.*, No.
11-15285 (MG).

[2] The case caption incorrectly lists General Maritime Corporation as the sole debtor-appellee, but both the record
below and the filings in this appeal indicate that "substantially all of its direct and indirect subsidiaries" were
involved in the Chapter 11 reorganization and were parties to the objections giving rise to the Disallowance Order.
Bankr. Doc. 996.

[3] Only Appellant's claim is at issue in this appeal.

Disallowance Order, issued after a hearing, overruled Appellant's response to Appellees'
objections and expunged the claims.  Bankr. Doc. 996.  For the reasons set forth below, the
Bankruptcy Court's order is AFFIRMED.

I.      **Background**

Appellees filed for Chapter 11 bankruptcy protection on November 17, 2011.  Bankr.
Doc. 1.  At the time, Appellant held $50,000 worth of Appellees' Senior Notes.  *See* Bankr. Doc.
988, Annex 1 (the "Proof of Claim").[4]  Pursuant to the reorganization plan, Appellees were to
distribute cash, equity and warrants to the Senior Notes Indenture Trustee.  *See* Bankr. Doc. 755
("Plan") at 17, 46.[5]  This distribution was to be passed on to the noteholders and would serve as
full satisfaction of their claims.  *See id.* at 25, 46.  Appellant acknowledges having received his
distribution from the Trustee.  *See* Doc. 16 at 11:14-15 ("I had already received a distribution for
the bonds.").  Nevertheless, Appellant filed a proof of claim for $81,250:  $50,000 for the
principal amount of the notes and $31,250 for "opportunity costs" and other damages.  *See* Proof
of Claim.  These damages are, at various points in Appellant's papers, attributed to fraudulent
inducement, fraudulent retention, breach of contract (the bond indenture), and breach of
fiduciary duty by Appellees.  *See, e.g.*, Proof of Claim; Bankr. Doc. 980 at 4 of 43; Doc. 9
("Appellant's Br.") at 2 of 17.

On April 15, 2013, Appellees filed an objection seeking to expunge a number of claims,
including Appellant's.  Bankr. Doc. 974.  Appellees' position was that the claims were subject to
mandatory subordination under section 510(b) of the Bankruptcy Code and would therefore not

---

[4] A copy of the Proof of Claim is also attached as Exhibit 1 to Appellees' Statement of Issues To Be Presented and
Cross-Designation of the Record on Appeal.  Doc. 3.

[5] Citations to the Plan refer to the page numbers appearing at the bottom of the original document, which spans
pages 4 of 144 through 72 of 144 of the electronic filing.

receive distributions under the Plan.  *See id.*  Appellant filed a response to the objection on May 6, 2013, and Appellees replied on June 4, 2013.  Bankr. Docs. 980, 988.  The Bankruptcy Court held a hearing on June 6, 2013.  *See* Bankr. Doc. 998 ("Bankr. Tr.").[6]  During the proceedings, the Bankruptcy Court noted that general unsecured creditors had received distributions ranging from 1.88 to 0.75 percent.  Bankr. Tr. at 6:24-7:1.  After discussing the court's prior decisions in *In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006), and *In re WorldCom, Inc.*, 329 B.R. 10 (Bankr. S.D.N.Y. 2005), the court concluded that the principles articulated in those cases "merely apply" to Appellant's claim.  Bankr. Tr. at 7:9-8:18.  In other words, according to the Bankruptcy Court, the same principles that required subordination of the claims at issue in *Enron* and *WorldCom* operated to compel subordination here.  The court therefore sustained Appellees' objection, overruled Appellant's response, and expunged Appellant's claim.  *Id.* at 8:18-21.  The Disallowance Order was issued the following day.  Bankr. Doc. 996.  This appeal followed. Doc. 1.

## II.     Discussion

### A.  Standard of Review of Bankruptcy Court Judgments

This Court has jurisdiction to hear appeals from decisions of a bankruptcy court pursuant to 28 U.S.C. § 158(a), which provides in relevant part that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees; . . . [and,] with leave of the court, from other interlocutory orders and decrees . . . of bankruptcy judges."  28 U.S.C. § 158(a)(1), (3).  A district court generally reviews the findings of fact of a bankruptcy court under a "clearly erroneous" standard, *see* Fed. R. Bankr. P. 8013, but conclusions of law are reviewed *de novo*.  *See, e.g.*, *Shugrue v. Air Line Pilots Assoc., Int'l (In re*

---

[6] Appellant waived his appearance at that hearing.  *See* Bankr. Doc. 1003.

*Ionosphere Clubs, Inc.)*, 922 F.2d 984, 988-89 (2d Cir. 1990); *Nova v. Premier Operations, Ltd.*
*(In re Premier Operations),* 294 B.R. 213, 217 (S.D.N.Y. 2003).

### B. Appellant's *Pro Se* Status

Because Appellant is proceeding *pro se*, his submissions "must be construed liberally and
interpreted 'to raise the strongest arguments that they *suggest*.'"  *Triestman v. Fed. Bureau of*
*Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (emphasis in original) (quoting *Pabon v.*
*Wright*, 459 F.3d 241, 248 (2d Cir. 2006))).

### C. The Bankruptcy Court Properly Subordinated and Expunged Appellant's Claim

As noted, Appellant does not contest that he received his *pro rata* distribution under the
Plan.  Because that distribution served as full satisfaction of the noteholders' claims, the $50,000
portion of Appellant's claim—representing the face value of his notes—was properly expunged.[7]

The focus of the instant appeal is on the $31,250 residual portion of Appellant's claim,
which the Bankruptcy Court expunged on the grounds that (1) the claim is subject to mandatory
subordination under section 510(b) of the Bankruptcy Code, and (2) since general unsecured
creditors were not paid in full on their claims, there would be no money available to pay any
subordinated claims.[8]

---

[7] The same applies to the balance of Appellant's claim to the extent it seeks to recover interest that Appellant would
otherwise have received during the life of the notes.

[8] The Bankruptcy Court did not explicitly link these two steps of the analysis, but this was the rationale underlying
Appellees' objection, which the court sustained.  *See* Bankr. Doc. 974 at 9 of 22.  In this regard, it bears noting that
section 510(b) only functions to subordinate, not to expunge, claims that fall within its scope. Here, as the
Bankruptcy Court noted, the asset pool was insufficient to pay general unsecured creditors in full; consequently,
there would have been nothing to distribute in satisfaction of Appellant's subordinated claim, even if he were able to
prevail on the merits.  Thus, Appellant's contention that section 510(b) is being applied in a way that "immunizes all
manner of wrongdoing" mischaracterizes the effect of mandatory subordination.  Appellant's Br. at 3 of 17.  All
section 510(b) does is prevent Appellant from enhancing the size of his claim relative to other general unsecured
creditors; what happens after that results solely from the depletion of the available asset pool.  *Cf. In re Bayou Grp.,*
*LLC*, 372 B.R. 661, 667 (Bankr. S.D.N.Y. 2007) ("But if the effect of subordination versus disallowance makes no
difference in a case where nothing is left for equity (including tort creditors subordinated to the level of equity under

Section 510(b) provides as follows:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, *for damages arising from the purchase or sale of such a security*, or for reimbursement or contribution allowed under section 502 on account of such a claim, *shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security*, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (emphasis added).  "Security" is defined to include, *inter alia*, notes, bonds and debentures.  *Id.* § 101(49)(A)(i), (iv)-(v).  By the plain terms of the statute, then, the Senior Notes are subject to subordination under section 510(b); the only question is whether Appellant's damages claim "arises from" his purchase of them.  The clear consensus in the case law is that it does.

Because fraudulent inducement, by definition, describes misconduct that occurred at the time a security was purchased, the statute on its face applies to any such claim.  The fraudulent inducement element of Appellant's claim was therefore properly expunged because any resultant damages clearly "arise from" Appellant's purchase of the notes.  *See Spirnak v. Motors Liquidation Co. GUC Trust (In re Motor Liquidation Co.)*, No. 11 Civ. 7893 (DLC), 2012 WL 398640, at *3 (S.D.N.Y. Feb. 7, 2012) ("[I]n chapter 11 liquidation proceedings, claims alleging 'fraud or other violations of law in the issuance of debtor's securities' must be subordinated to the claims of general creditors." (quoting *Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251, 256 (2d Cir. 2006))); *see also Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 140 (3d Cir. 2002) (noting that "claims alleging illegality in the issuance of securities fall squarely within the intended scope of § 510(b)").

---

Section 510(b) after payment to other creditors), it makes a great deal of difference in a case such as this where the claims of creditors (other than tort claims creditors subordinated under Section 510(b)) do not exhaust the assets in the debtors' estate which are available for distribution.").  Appellant's federal takings and due process arguments fail for the same reason.  *See* Appellant's Br. at 8 of 17.

The remaining theories of recovery—fraudulent retention, breach of fiduciary duty, and breach of contract—pertain to post-acquisition conduct on the part of Appellees.  However, the outcome under section 510(b) is the same.

In expunging Appellant's claim, the Bankruptcy Court correctly observed that courts interpret section 510(b) broadly, citing *Enron* and *WorldCom*.  *See* Bankr. Tr. at 7:9-24; *see also Enron*, 341 B.R. at 153-54 ("[T]he majority of courts in recent years that have confronted related issues concerning the scope of section 510(b) have concluded that the phrase 'arising from' should be read broadly to encompass claims, such as claims for breach of contract, even more indirectly related to the purchase or sale of a security."); *id.* at 157 ("Recognizing then, the weight of precedent favoring the subordination of fraudulent retention claims, and the absence of persuasive precedent upholding the contrary position, the ambiguity *vel non* of the statutory text is ultimately irrelevant.").  In arriving at this broad interpretation, courts generally require a showing of "some nexus or causal relationship" between the original purchase and the asserted claim.  *Telegroup*, 281 F.3d at 138; *see also Enron*, 341 B.R. at 152 (adopting the standard set forth in *Telegroup*).[9]

As the *Enron* court observed, courts have consistently subordinated fraudulent retention claims.  *See In re Lehman Bros. Inc.*, No. 14 Civ. 1742 (SAS), 2014 WL 4393419, at *4 (S.D.N.Y. Sept. 5, 2014) ("[S]ection 510(b) has been applied broadly to subordinate claims arising in a variety of contexts, such as claims based on fraudulent retention . . . ."); *see also WorldCom*, 329 B.R. at 15 ("The purported distinction between a stockholder damage claim in

---

[9] While *Enron*, as a lower court opinion, is not binding on this Court, the Second Circuit has cited to it approvingly in arriving at its own broad interpretation of section 510(b).  *See Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251, 257 (2d Cir. 2006) (referencing "the recent and extraordinarily thorough decision in *In re Enron*"); *see also KIT digital, Inc. v. Invigor Grp. Ltd. (In re KIT digital, Inc.)*, 497 B.R. 170, 181-82 (Bankr. S.D.N.Y. 2013), *as corrected* (Dec. 2, 2013) (observing that *Med Diversified* cited both *Enron* and *Telegroup* approvingly six times, without limiting or questioning either opinion).

respect of the purchase or sale of a security, on the one hand, and a damage claim in respect of retention of the security, on the other, is entirely illusory and must be rejected as a matter of law."); *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 260 B.R. 517, 523 (B.A.P. 10th Cir. 2001) ("Allen contends that there must be a causal connection between the purchase or sale of the securities and the damages alleged.  We do not necessarily disagree with this argument but instead conclude that such a connection exists where the holder of securities alleges post-investment fraud."), *aff'd*, 281 F.3d 1173 (10th Cir. 2002).

While not every breach of contract claim is subject to mandatory subordination, the key again is whether the requisite nexus is present to tie the specific claim at issue to the claimant's initial purchase of his securities.  *See Enron*, 341 B.R. at 162 ("[I]f the subordinated securities claim and the breach of contract claim relate to the same transaction and describe the same pattern of events and facts, but differ only in the source of the obligation, duty, or right, then the breach of contract claim will be subordinated.").  Here, there can be little doubt that this nexus exists.  Indeed, in the proceedings below, Appellant himself described his claim as "a hybrid of fraudulent inducement, fraudulent retention and breach of contract," arguing that "[e]ither these [indenture] provisions were breached, or were never intended to be honored (fraudulent inducement), or were intended to be honored when the indenture was issued but subsequently ignored by insiders . . ., thus giving rise to fraudulent retention."  Bankr. Doc. 980 at 4 of 43. The claim is thus, by Appellant's own admission, clearly rooted in a single set of operative factual allegations regarding insider dealings, and the fact that Appellant alternatively styles Appellees' alleged malfeasance as fraud or as breach of the bond indenture cannot remove the claim from the reach of section 510(b).[10]

---

[10] In his reply brief, Appellant asserts that section 510(b) should not apply to "contracted interest" or "diminutions [sic] in value caused by breaches of fiduciary duty law or of disclosure law."  Doc. 20 ("Appellant's Corrected

Because there can be no question that Appellant's notes are "securities" within the

meaning of the Bankruptcy Code, and because Appellant is attempting to assert claims for

damages that "arise from" his purchase of those securities, the $31,250 portion of his claim is

subject to mandatory subordination under section 510(b) of the Bankruptcy Code.[11]  Since

---

Reply Br.") at 3 of 5.  In other words, what Appellant really seeks to recover is the expected but unrealized return on his investment in the notes.  But that is exactly the type of claim to which section 510(b) must be applied.  *See In re Lehman Bros. Inc.*, 14 Civ. 1742 (SAS), 2014 WL 4393419, at *6 (S.D.N.Y. Sept. 5, 2014) ("[R]egardless of the type of claim, precedent requires subordination of claims by *security holders* that seek to recover . . . for *the loss in value* of a security issued by the debtor or an affiliate." (emphasis in original)).

[11] The Court concedes that there is some force to Appellant's observation that courts' rationale for adopting a broad reading of section 510(b) has been focused primarily on equity investors.  Indeed, in most instances where courts have adopted a broad reading of section 510(b), they have done so based primarily on the provision's legislative history, which was focused in large part on the "absolute priority rule" aimed at ensuring that equity interests are subordinated to creditor interests in bankruptcy.  *See, e.g., Med Diversified*, 461 F.3d at 256 ("Because there are only two rationales for mandatory subordination expressly or implicitly adopted by the Congress that enacted section 510(b), we conform our interpretation of the statute to require subordination here only if Rombro (1) took on the risk and return expectations of a shareholder, rather than a creditor, or (2) seeks to recover a contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor."); *Telegroup*, 281 F.3d at 141 ("Section 510(b) thus represents a Congressional judgment that, as between shareholders and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of stock in the event the issuer enters bankruptcy."); *KIT digital*, 497 B.R. at 181 (noting that courts have adopted a broad reading of section 510(b) in order "to effect its purposes of addressing the dissimilar risk and return expectations of shareholders and creditors; the reliance of creditors on the equity cushion that stockholders' investments provide; and to avoid bootstrapping of equity interests into creditor claims").  Both *Enron* and *WorldCom* involved subordination of claims brought by equity investors.

However, even if the initial rationale for reading section 510(b) broadly was based on this perceived legislative intent, that reading—once extended to a particular type of *claim*—cannot be selectively enforced based on the type of *security* at issue.  The plain text of the statute, which expressly includes debt instruments within the definition of "security," precludes such a result.  *Cf. Enron*, 341 B.R. at 156 n.12 (identifying this "possible tension between the text as written and the policy judgments motivating 510(b)").  In other words, a judicially driven expansion of the phrase "arising from" cannot function to limit the congressionally mandated definition of "security."  Even if Congress was *motivated* by concerns related to equity interests, the plain text of the statute clearly extends its reach to debt as well.  *See Lehman Bros.*, 2014 WL 4393419, at *4 ("[S]ection 510(b) is not limited to shareholder claims."); *see also Levine v. Resolution Trust Corp. (In re Coronet Capital Co.)*, No. 94 Civ. 1187 (LAP), 1995 WL 429494, at *8 (S.D.N.Y. July 20, 1995) ("Appellants appear to argue that § 510(b) should be restricted to claims involving equity securities.  However, this argument is not supported by the [Bankruptcy] Code.").  At least one circuit court has expressly affirmed the subordination of a debt holder's claim for damages based on post-acquisition fraud.  *See Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173 (10th Cir. 2002).  *WorldCom*, though itself dealing with an equity claim, both cited *Geneva Steel* in support of its holding and, in offering an example of a claim that would not "arise from" the purchase or sale of a security, cited a debenture holder with a claim for breach of a supply contract "entirely independent of his status as a debenture holder."  329 B.R. at 14 n.2, 17.  The negative implication of that example, of course, is that a contract claim based on the debt instrument itself *would* be subject to subordination.

The Second Circuit cases to which Appellant cites are distinguishable and therefore do not compel a different outcome.  *Med Diversified*, for instance, relied on policy arguments to extend section 510(b)'s reach to encompass a debtor's failure to issue common stock in accordance with a termination agreement.  *See* 461 F.3d at 253.  In other

general unsecured creditors did not receive payment in full on their claims, it necessarily follows

that no assets remained for distribution in satisfaction of any subordinated claims.  The

Disallowance Order thus properly expunged Appellant's claim in its entirety.[12]

---

words, the claim in that case arose precisely because the claimant never received any securities at all, and yet the
court still required subordination.  In *CIT Group Inc. v. Tyco International, Inc. (In re CIT Group Inc.)*, 479 F.
App'x 393 (2d Cir. 2012) (summary order), the question was whether a claim for breach of a tax agreement
accompanying an initial public offering ("IPO") was sufficiently related to that IPO to merit subordination.  And, in
*Waltzer v. Nisselson (In re MarketXT Holdings Corp.)*, 346 F. App'x 744 (2d Cir. 2009) (summary order), the court
affirmed the subordination of a claim that both fell within the plain meaning of the statute and implicated its
underlying policy rationales.  In none of these cases did the court decline to subordinate the claim of a security
holder who was seeking to recoup the diminished value of his investment, nor does this Court read the Second
Circuit's decisions to suggest that section 510(b) does not extend to claims arising from debt securities.  As noted,
such a reading would contravene the plain meaning of the Bankruptcy Code.  *Cf. Lehman Bros.*, 2014 WL 4393419,
at *4 (noting that *Med Diversified*'s discussion of the risk-allocation rationale for section 510(b) is "incomplete," in
part, because it fails to account for the inclusion of debt instruments within the definition of "security").

Therefore, because Appellant's claims are of the type that courts routinely subject to mandatory subordination under
section 510(b), it is of no moment that Appellant held debt instead of equity.

[12] Appellant argues that, in light of his allegations of insider dealings, senior creditors' claims may be subject to
equitable subordination under section 510(c) of the Bankruptcy Code.  *See* Appellant's Br. at 7 of 17.  He also
suggests that the Court should recharacterize those senior creditors' loans as capital contributions.  *See id.* at 7-8 of
17 (arguing that the section 510(c) standard is satisfied, as is "the test for recasting a loan as a capital contribution
and subordinating it as an equity claim").  Because neither equitable subordination nor recharacterization was raised
in Appellant's opposition to Appellees' objections below, the Court declines to entertain such arguments for the first
time on appeal.  *See, e.g., Sumpter v. DPH Holdings Corp. (In re DPH Holdings Corp.)*, 468 B.R. 603, 619
(S.D.N.Y. 2012) (observing that, even if faced with a pure question of law, "it is in this Court's discretion whether
to review issues raised for the first time on appeal").

Relatedly, in his reply brief, Appellant suggests that the Court should lift the automatic stay in order to allow him to
pursue his claims in a non-bankruptcy forum, suggesting that, if he were able to prove his fraud and fiduciary duty
claims, his claim would be rendered "nondischargeable or treated like unimpaired claims of insiders."  Appellant's
Corrected Reply Br. at 2 of 5.  The only discussion of the automatic stay, however, is in an excerpt from a treatise
discussing the Sarbanes-Oxley Act and the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, *see*
Bankr. Doc. 980 at 4 of 43; Appellant's Br. at 6 of 17, and the changes effected by those statutes apply only to
individual, and not to corporate, bankruptcies.  *See Med Diversified*, 461 F.3d at 257 n.1 ("We also find a measure
of support in the fact that Congress did not elect to address this trend in the courts, leaving section 510(b) unchanged
by the recent bankruptcy reform legislation, the Bankruptcy Abuse Prevention and Consumer Protection Act of
2005." (citation omitted)); *WorldCom*, 329 B.R. at 13 ("The simple answer to this contention is that Section
523(a)(19) [a provision added to the Bankruptcy Code as part of Sarbanes-Oxley] is applicable only to individual
debtors.  It has no application to corporate debtors such as WorldCom.").

### III.     Conclusion

For the reasons set forth above, the Bankruptcy Court's June 7, 2013 Order is

AFFIRMED.  The Clerk of the Court is respectfully directed to docket this decision, mail a copy

to Appellant, and close the case.

It is SO ORDERED.

Dated:     September 29, 2014
           New York, New York

                                        Edgardo Ramos, U.S.D.J.